TO BE PUBLISHED IN F. SUPP.2D


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON


CIVIL ACTION NO. 2010-123 (WOB-CJS)

HARLAN LEE, Administrator of
Estate of Katelyn M. Lee, and
HARLAN LEE and PENNY LEE,
Individually                                    PLAINTIFFS


VS.                    OPINION AND ORDER


THE MEDICAL PROTECTIVE
COMPANY                                          DEFENDANT


BERTELSMAN, Senior District Judge:

    This is a third-party bad faith action against an
insurer arising out of a medical malpractice suit brought
against its insureds in state court in Kentucky.

    This matter is before the Court on defendant's motion
for summary judgment (Doc. 94).  The Court heard oral
argument on this motion on October 5, 2012, and the parties
thereafter submitted supplemental authorities.  (Docs. 136,
137).  After further study, the Court now issues the
following Opinion and Order.

## *Factual and Procedural Background*

**A.    Penny Lee's Pregnancy**

The relevant facts in this matter, while tragic, are not in dispute.  In 2003, plaintiff Penny Lee ("Penny") was pregnant with her second child and was a patient of Maysville Obstetrics and Gynecological Associates, P.S.C. ("MOGA") in Maysville, Kentucky.  Penny was seen by all three doctors at MOGA during her pregnancy, but her primary contact was with Dr. Laura Shower ("Dr. Shower").  MOGA also employed two ultrasound technicians: Carol McCord ("McCord") and Tamala Humphries.

On April 18, 2003, Penny underwent a twenty-week ultrasound which identified two potential problems: it did not adequately show all four chambers of the heart due to the position of the baby, and it showed a posterior marginal placental previa, which meant that the placenta was low and near the cervix.  Dr. Shower reviewed this ultrasound and ordered a follow-up ultrasound, which was scheduled for July 9, 2003.

McCord performed the second ultrasound test on July 9, 2003.  Dr. Shower read this ultrasound and interpreted it as being within normal limits both as to the imaging of the heart as well as the progression of the marginal placenta previa.  Dr. Shower thus ordered no follow-up ultrasound.

Penny went into labor on September 1, 2003, and was admitted to the hospital, where she was seen by Dr. Shower and Nurse Cindy Ginn ("Ginn").  Ginn testified that Penny was three centimeters dilated and that, upon vaginal exam, there was no bleeding, which would have indicated that the placenta was covering all or part of the cervix.  Dr. Shower also testified that her examination of Penny did not indicate that either the placenta or the umbilical cord was near the cervix.

When Penny's labor did not progress, Dr. Shower administered the drug Pitocin to stimulate contractions. Dr. Shower also decided to use an intrauterine pressure catheter (IUPC) to measure the strength of the contractions.  When she did not see a flow of amniotic fluid upon insertion of the IUPC, Dr. Shower concluded she needed to puncture the membrane in order to properly position the IUPC.  When she inserted an amnio hook to do so, however, dark red blood rather than amniotic fluid appeared.

The baby's heartbeat immediately began to drop and, after physical maneuvers were unsuccessful in normalizing the heart rate, Dr. Shower ordered that an emergency C-section be performed.  The procedure was delayed, however, as there was no anesthetist on duty at the hospital because

it was a holiday weekend.  By the time the baby, Katelyn, was born, she had lost half her blood volume and had to be resuscitated.  Katelyn died three weeks later, on September 24, 2003, at Cincinnati Children's Hospital due to the lack of oxygen and blood flow to her brain at birth.

**B.    The Medical Malpractice Action**

The Lees filed suit against MOGA and Dr. Shower on September 22, 2004, in Mason Circuit Court.  The Medical Protective Company ("MedPro"), the malpractice insurer of both MOGA and Dr. Shower, provided a defense.  The trial attorney for MOGA and Dr. Shower was Frank Benton ("Benton"), and lead trial counsel for plaintiffs was William Garmer ("Garmer").

Plaintiffs' theory of their case was summarized in their Pretrial Memorandum:

> Had these ultrasounds been accurately assessed and further examination ordered, a routine C-section could have been planned for a safe and healthy birth. Instead, Dr. Shower failed to properly interpret the ultrasounds; she failed to employ other techniques in the followup ultrasound; she failed to refer Penny to more advanced ultrasound technology available in the area for further diagnosis; she erroneously proceeded with the vaginal delivery that led to Katelyn's critical injuries; she erroneously employed an amnio hook and IUPC; and she failed to perform a timely C-section [as] soon as the emergency became apparent.

(Doc. 94-4 at 23).

4

In early May 2007, plaintiffs made a demand of $1 million on Dr. Shower, which represented her policy limits, but she did not consent to settle.  On May 23, 2007, Dr. Shower signed a consent to settlement form, but she did not ask that MedPro settle the case.

Trial began on June 25, 2007.  The evidence was undisputed that the post-operative examination of the placenta had revealed that there was a velamentous insertion of the umbilical cord, which means that some membranes of the cord are actually outside of the placenta and unprotected by the normal covering.  It was this section of the cord that had been punctured by the amnio hook used by Dr. Shower.

Plaintiffs presented the testimony of two experts, Dr. Beverly Coleman, a radiologist, and Dr. Curtis Cetrulo, an obstetrician and gynecologist.

Dr. Coleman testified that the follow-up ultrasound performed on July 9 should have been done sooner and that the report prepared by McCord from the test did not accurately depict where the placenta ended because the still photos taken during the ultrasound did not show the bottom of the placenta and the top of the cervix.  (Doc. 122-4 at 28-29, 50-59, 68-70).  She testified that a transvaginal ultrasound should have been done to get a

better image, and, had such follow-up been done, it would have shown the low placenta and a routine C-section could have been scheduled. (Doc. 122-4 at 59, 68-70). Dr. Coleman also testified that a low placenta makes a velamentous cord insertion more likely. (Doc. 122-4 at 46-47).

Similarly, Dr. Cetrulo testified that a vaginal ultrasound should have been done as follow-up to the July 9, 2003 transabdominal ultrasound, which was incomplete in its imaging of the placenta. (Doc. 122-6 at 60, 67-68, 72-78).

On June 29, 2007, the jury returned a verdict finding that Dr. Shower was not negligent but that MOGA was. (Doc. 113-1). The jury awarded compensatory damages totaling $617,888.03 to Katelyn's estate and to her parents, but it awarded no damages for the loss of Katelyn's power to earn money. MOGA thereafter filed a motion to vacate the judgment, and the Lees filed a motion for a new trial seeking additional damages for loss to the estate of the power of the decedent to earn money.

On July 23, 2007, plaintiffs made a settlement demand on MOGA for $900,000.00, stating that the offer would be open only until July 27. (Doc. 94-5 at 29-30). Three days later, Benton responded that he was forwarding the demand

to MOGA, whom he said he thought "would be interested in negotiating a resolution to this inconsistent verdict." (Doc. 94-5 at 32).

The Court held a hearing on the parties' post-trial motions on July 27, 2007, and it stated:

> You never know what the jury is thinking, and again, with regard, Mr. Benton to your motion, there's, **I feel that when a jury is confronted with two possible defendants, one who is present for five days and involved with the jury, and the other one is not, I think, given that choice, it's much easier for the jury to come back with a finding against the entity which is not physically present in person,** and I think under the circumstances a different amount should be given but didn't want to confront the person that was here and I don't think it's fair to vacate the verdict against the practice and then leave nothing to the plaintiff. It's clear the jury wanted them to have something. **Had they not been given the choice of the doctor and the practice, there might have been a little different argument, but I think the Court of Appeals will tell us what to do.**

(Doc. 122-1 at 16) (emphasis added).

On August 2, 2007, the Mason Circuit Court denied the parties' post-trial motions.

The parties cross-appealed, with the Lees arguing that the jury improperly failed to award damages for Katelyn's lost earnings, and MOGA arguing that the evidence was insufficient to support a finding of negligence against it. (Docs. 121-2 to 121-5). The Lees did not cross-appeal the jury's finding that Dr. Shower was not negligent, nor did

MOGA ask for a new trial based on the apparently inconsistent verdict.

On August 29, 2008, the Kentucky Court of Appeals issued an Opinion affirming the judgment against MOGA, reversing the trial court's denial of the Lees' motion for a new trial, and remanding the case for a new trial on the issue of damages for Katelyn's lost power to earn money. (Doc. 94-7 at 24-36).

On September 2, 2008, plaintiffs made a demand of $1 million, stating that the offer would be withdrawn if MOGA sought discretionary review in the Supreme Court of Kentucky. (Doc. 94-5 at 34-35). By letter dated September 17, 2008, MOGA declined plaintiffs' demand, stating: "There is just no evidence of any negligence imputable to the P.S.C. Nevertheless, we will be happy to consider any other proposal you may wish to make in order to conclude the case expeditiously." (Doc. 94-5 at 37).

MOGA thereafter filed a petition for discretionary review in the Supreme Court of Kentucky (Doc. 121-6), which plaintiffs opposed (Doc. 121-7). On August 19, 2009, the Supreme Court denied MOGA's petition.

Three weeks later, on September 11, 2009, MedPro offered to settle the case for MOGA's $1 million policy limit. (Doc. 95-5 at 41). Plaintiffs countered at

$1,115,461.91, based on their position that they were entitled to post-judgment interest. (Doc. 94-6 at 2). After further discussions on the topic of interest, on October 13, 2009, plaintiffs accepted MOGA's offer to settle for $1 million. (Doc. 96-6 at 13).

On May 14, 2010, plaintiffs filed the instant action in state court, and defendant removed to this Court on June 7, 2010. (Doc. 1).

### *Analysis*

**A.  The Language of the Kentucky Bad Faith Cases is Inconsistent.**

It is undeniable that the Kentucky bad faith cases contain language that is seemingly contradictory concerning the standard to be used in deciding such claims.

For example, some cases hold that bad faith must rise out of a state of mind that would justify an award of punitive damages and that plaintiff's failure to prove such a state of mind must result in a directed verdict against him or her. *See, e.g., Wittmer v. Jones,* 864 S.W.2d 885 (Ky. 1993) (leading case for this test). In addition, the Supreme Court of Kentucky has held that an insurance company "is entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts."

*Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d 437, 454 (Ky. 1999) (citations omitted).

Other cases, however, hold that "fairly debatable" does not mean that an insurer is relieved of its duty to "investigate, negotiate, and attempt to settle the claim." *Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368, 375 (Ky. 2000).  In *Farmland*, the Court also cited with approval a decision of the Supreme Court of Arizona which held that "whether a claim or the amount of a claim is fairly debatable is a question of fact for the jury." *Id.* at 376 (citing *Zilisch v. State Farm*, 995 P.2d 276 (Ariz. 2000)). This language is directly contrary to *Wittmer's* holding that a directed verdict is appropriate unless the company acts with malice sufficient to justify an award of punitive damages.[1]

Good advocates that they are, counsel in the instant case quote the language from the precedents that is favorable to their position, ignoring the cases with contrary language.  At oral argument, counsel for defendant suggested that the cases favoring liability were first-party cases, while cases embodying the more stringent standard were third-party cases.  A review of the cases does not support this theory, however, since some of the

---

[1] The dissent in *Farmland* opined that the majority's opinion represented a "significant departure" from the holding in *Wittmer*.  *Id.* at 384.

cases adopting the more expansive standard were third-party cases.  *See, e.g., Phelps v. State Farm,* 680 F.3d 725 (6th Cir. 2012) (dictum); *The Medical Protective Co. v. Wiles*, No. 2010-CA-000262-MR, 2011 WL 2420011 (Ky. Ct. App. Oct. 21, 2011).

Is there, then, any way to reconcile these cases? Yes, by reading the language in the light of the facts.

**B.    The Cases Can Be Reconciled By Analysis of Their Facts.**

**1.    *The expansive standard***

On examining the facts of the cases, it may be seen that those that use the language implying a more expansive approach to a finding of bad faith present factual situations where liability was clear and the conduct of the insurance company was oppressive.  Thus, in *Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368 (Ky. 2000), the leading case adopting the expansive approach, the insurance company misrepresented the terms of the policy to its insured.  *Id.* at 377.  The company falsely told the insured that his fire policy -- under which coverage for the fire loss was undisputed -- provided for a recovery of "the cost of repair less depreciation" when actually it provided for "the cost of replacement less depreciation."  The insurance company proceeded to negotiate using the erroneous basis

11

and used other oppressive tactics toward its insured. *Id.* at 372-74.

Another case discussing approvingly an expansive view is *Phelps v. State Farm Mut. Auto. Ins. Co.,* 680 F.3d 725 (6th Cir. 2012). This was a third-party case in which liability was clear. The policy limits were $50,000 and the claimant's medical and wage loss was $22,000. Despite the clear liability and obvious fair settlement value at the policy limits, the company stalled the claimant for years, made an offer of $25,000, refused to reveal its policy limits, and engaged in other nefarious tactics in the face of the indisputable liability. *Id.* at 733-35. The company dragged the case on for two years, and forced the insured to file suit. After the ultimate settlement of the underlying suit, plaintiff filed the bad faith action. The trial court granted summary judgment, but the Sixth Circuit reversed.

The Court extensively discussed the expansive language of *Farmland,* but it also held that the strict standard, discussed below, was met. *Id.* at 732-33. Other cases cited by plaintiffs herein involve similar dynamics or are clearly not in point.[2]

---

[2] *See, e.g., Rawe v. Liberty Mut. Fire Ins. Co.,* 462 F.3d 521 (6th Cir. 2006) (recognizes *Wittmer* standard; trial court erred in granting judgment on the pleadings; oppressive conduct by company); *Estate of*

## 2.   *The Strict Standard*

The greater number of the Kentucky bad faith cases are governed by the standards set forth in the landmark case, *Wittmer v. Jones,* 864 S.W.2d 885 (Ky. 1993).  In *Wittmer,* a third-party suit for property damage to an automobile, the liability was clear but the amount of damages was subject to dispute, primarily whether cost of repair or the cost of replacement of the car should be the measure of the loss. *Id.* at 887.  The proof of damages submitted by the claimant was lacking in several respects.  Liability and bad faith were both submitted to a jury, and the jury found for the insurance company on the bad-faith claim.  *Id.*  The Court of Appeals reversed, and the Supreme Court granted discretionary review.

The Supreme Court of Kentucky took the opportunity to establish criteria for bad-faith actions:

> [A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a

---

*Riddle v. Southern Farm Bur. Life Ins. Co.,* 421 F.3d 400 (6th Cir. 2005) (retroactive post-death review of application made by nit-picking series of reviewers in apparent effort to defeat coverage); *Dailey v. American Growers Ins.,* 103 S.W.3d 60 (Ky. 2003) (lower courts mistakenly applied federal law); *Stevens v. Motorists Mut. Ins. Co.,* 759 S.W.2d 819 (Ky. 1988) (pre-*Wittmer*); *Harrod v. Meridian Mut. Ins. Co.,* 389 S.W.2d 74 (Ky. 1965) (bad faith is "not merely negligence" but "imports a dishonest purpose of some moral obliquity" and "implies conscious doing of wrong') (it is not clear to the Court why plaintiffs cited this case as it is directly contrary to their position).

reasonable basis in law or fact for denying the claim;
and (3) it must be shown that the insurer either knew
there was no reasonable basis for denying the claim or
acted with reckless disregard for whether such a basis
existed . . . [A]n insurer is . . . entitled to
challenge a claim and litigate it if the claim is
debatable on the law or facts.

*Id.* at 890 (quoting *Federal Kemper Ins. Co. v. Hornback*,
711 S.W.2d 844, 846-47 (1986) (Leibson, J., dissenting)).

The court also went on to hold: "Before the cause of
action exists in the first place, there must be evidence
sufficient to warrant punitive damages." *Id.* That is,
"sufficient for the jury to conclude that there was conduct
that is outrageous, because of the defendant's evil motive
or [its] reckless indifference to the rights of others."
*Id.* (internal quotations and citation omitted).

Further, the Court emphasized that, if there was not
sufficient proof of intentional misconduct to warrant
punitive damages, the insurer was entitled to a directed
verdict. *Id.*

### 3.   *The Case at Bar*

Turning to the case at bar, as the procedural
history above makes apparent, the analysis must be geared
to the various stages of the underlying malpractice case.

It is important to note at the outset that there is no
claim for bad faith prior to the return of the verdict in
the state trial court.  The case could not be settled until

shortly before that time, because Dr. Shower had not given her consent to settle, which was her privilege under the policy, as is standard in medical malpractice insurance liability policies.

Therefore, the first issue is: did defendant exercise bad faith in taking the appeal to the Kentucky Court of Appeals?  It is clear to this Court that the *Wittmer* strict standard requires a finding of no bad faith at this step, because there was a valid argument to be made that the verdict was inconsistent and against the weight of the evidence.

This Court has reviewed the applicable portions of the state trial court record and the appellate briefs.  The evidence of any negligence that would not have involved Dr. Shower, who was exonerated, was scant to non-existent.[3]

_____

[3]  Plaintiffs defended the jury's verdict by arguing that a nurse employed by MOGA, Carol McCord, was negligent in performing an ultrasound on Penny Lee on July 9, 2003.  Specifically, plaintiffs argued that the ultrasound failed to adequately show the location of the placenta in relation to the opening of the cervix and that a trans-vaginal ultrasound should have been ordered as a follow-up measure. (Doc. 121-3 at 7-8).

Even if the jury could reasonably have accepted this testimony as evidence of negligence by McCord – and thus MOGA – that finding cannot be reconciled with the jury's exoneration of Dr. Shower because Dr. Shower was equally responsible for that test.  It was undisputed that Dr. Shower, as the attending physician, was responsible for reviewing the ultrasound, that she did review it, and that she found everything to be within normal limits.  If the ultrasound was inadequate, then Dr. Shower failed to recognize that fact and respond appropriately.

Moreover, it was undisputed that McCord did not have the authority to order a follow-up transvaginal ultrasound on her own – it required an order from the reviewing doctor.  Thus, if the failure to order a vaginal ultrasound was negligent – as plaintiffs' experts

There was a substantial argument to be made that MOGA was entitled to a directed verdict, since Dr. Shower had been found without fault.  Taking the appeal did not suggest a motive of malice or oppression on the part of defendant as required by the *Wittmer* doctrine.

The Court of Appeals affirmed the decision of the trial court to let the verdict stand, but the appellate opinion -- while stating that there was evidence of negligence on the part of MOGA -- did not specifically point to any.

Defendant was, therefore, faced with the decision whether or not to move for discretionary review in the Supreme Court of Kentucky.

It is true that the Supreme Court, quite rightly, grants discretionary review in only a small percentage of civil cases presented to it.  Nevertheless, defendant's filing the motion for discretionary review does not violate the *Wittmer* standards any more than taking the appeal did. There was at least a substantial chance the Supreme Court would choose to address the problem presented by the unusual nature of the apparently inconsistent verdict.

---

testified it was – then that negligence fell to Dr. Shower and not Carol McCord.

This Court need not address defendant's argument that
if found liable for bad faith it would be deprived of its
constitutional right of appeal, but this Court will observe
that it would be a bad precedent to hold a litigant in bad
faith for seeking review in the Supreme Court of a state or
of the United States, if it has a non-frivolous issue to
present, just because such motions are rarely granted.

### 4.   *Failure to Negotiate*

Defendant did not make any settlement offer until the
motion for discretionary review was denied.  Did it then
violate a duty to negotiate?

As the state trial judge pointed out, the jury
apparently thought the plaintiffs should recover a
substantial amount.  But in their verdict they did not
follow the instructions of the court.  They found for Dr.
Shower, probably because they liked her.  They found
against MOGA, probably because it was a corporation.  They
awarded all the damages under loss of consortium because
they could understand that concept.  But they awarded
nothing to the estate for loss of the decedent's power to
earn money, because jurors tend to be offended when people
seek money for the loss of a small child.

Experienced claims managers value a case by assessing
the estimated recovery discounted by the probability of

liability.[4]  So before the verdict, a reasonable evaluation might have been about $200,000 ($400,000 if clear liability multiplied by a 50% chance of recovery).  After the verdict, the record shows that MedPro performed this kind of evaluation and set a reserve at the amount of the verdict plus interest.  (Duechle Depo. 133-34) (Doc. 114-1).  After the affirmance on appeal, the settlement value would probably have been about $650,000 ($720,000 x 90% chance of liability.)[5]

So, the issue is: Did the company have a duty to make a settlement offer at any or all of these stages?

It is true, as argued by the plaintiffs, that *Farmland* stated: "Although there may be differing opinions as to the value of the loss . . ., an insurance company still is obligated under the KUCSPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner."  *Farmland*, 36 S.W.2d at 375.

Taken in context, however, this language was clearly limited to cases where liability was a certainty.

---

[4]  In evaluating a case, an insurance company usually uses a process sometimes known as the "Lloyd's of London" test.  This method is taught by the Federal Judicial Center and is commonly used in settlement conferences.

[5]  A typical award for the loss of the power to earn money probably would not exceed $100,000.  The jury is to be advised of other items of damages recovered by the parents and is not bound by the testimony of plaintiffs' experts.  Turfway, 834 S.W.2d at 671-73.

In later cases, the Supreme Court of Kentucky has held that the language does not apply when liability is not certain.  For example, the Court held that there was a duty to negotiate where the liability is "reasonably clear." *Coomer v. Phelps,* 172 S.W.3d 389, 395 (Ky. 2005).  This means, the Court squarely held, that an insurer is required to "make a good faith attempt to settle any claim, *for which liability is beyond dispute,* for a reasonable amount. *Id.* (emphasis added.)

The Court further observed: "The language of the [KUCSPA] is simply inadequate to establish a broad-based requirement that insurance settlements must always be 'fair and equitable' in the traditional sense."  *Id.*

Subsequent cases are in harmony with the *Coomer* case. *See Hamilton Mut. Ins. Co. of Cincinnati v. Buttery,* 220 S.W.3d 287, 293-95 (Ky. Ct. App. 2007) (undisputed coverage under burglary policy); *United Serv. Auto Ass'n v. Bult,* 183 S.W. 3d 181, 183 (Ky. Ct. App. 2006) (no liability for mere delay "absent some further act of harassment or deception) (citing *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.,* 880 S.W.2d 886, 888 *(*Ky. 1994)); *Rybinski v. State Farm Fire & Cas. Co.*, No. 5:09-CV-151, 2012 WL 289913, at *6-7 (W.D. Ky. Jan. 31, 2012) (evil motive or reckless indifference required, even in

first-party case); *Powell v. Cherokee Ins. Co.,* No. 5:09-CV-00205-R, 2011 WL 2160856, at *9 (W.D. Ky. June 1, 2011) (under *Wittmer* rule, company could litigate doubtful damages unless there is evidence of "unsavory motives"); *Jones v. Liberty Mut. Fire Ins. Co.,* Civil Action No. 3:04-CV-137, 2009 WL 425023, at *4-6 (W.D. Ky. Feb. 19, 2009) (no bad faith where there was a material debate concerning extent of plaintiff's injuries).

Plaintiffs here rely heavily on the decision of the United States Court of Appeals for the Sixth Circuit in *Phelps v. State Farm Mut. Auto. Ins. Co.*, 680 F.3d 725 (6th Cir. 2012). Plaintiffs quote liberally from the Court's discussion of the cases applying what has been called herein the "expansive" standard, citing the fact that the Court reversed a grant of summary judgment.[6]

What plaintiffs ignore, however, is that the Court ultimately applied the strict *Wittmer* standard and held that there was enough evidence that the insurance company could be found to have violated that standard by its oppressive delay and hard-nosed settlement techniques employed despite admitted liability -- factors which are lacking in the case at bar. *Id.* at 732-35.

---

[6]  The recent decision of the Sixth Circuit in *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, No. 11-5965, 2012 WL 4839767 (6th Cir. Oct. 9, 2012), reaffirms the strict standard without mentioning *Phelps*.

This Court holds, therefore, that this was not a case where "liability was beyond dispute."  Therefore, the insurance company had a right to defend the case until appellate review was final without making an offer.

### 5. *Plaintiffs' Experts*

In *Phelps*, the Sixth Circuit also opined that opinions of the experts proffered by the plaintiffs should have received more consideration by the trial court.  *Id.* at 735.

Here, plaintiffs offer the testimony of certain experts to the effect that defendant maintains a culture of profit-making rather than service to the public by, *inter alia,* offering bonuses and other incentives to keep claim payments to a minimum.

As discussed above, because defendant had a right to litigate its case as long as liability was not "beyond dispute," it had no duty to make an offer before it actually did.  Therefore, its "culture" is irrelevant and these declarations raise no triable issue of bad faith. *See Powell v. Cherokee Ins. Co.*, No. 5:09-CV-00205-R, 2011 WL 2160856, at *12 (W.D. Ky. June 1, 2011) ("Quinley's Report and deposition testimony cannot change the immutable finding of this Court when it reviews the offered proof in the light most favorable to [the plaintiff]: there is no

evidence that reveals some act of conscious wrongdoing or recklessness on the part of the insurer.") (citation and internal quotations omitted).[7]

### 6. *Interest*

Finally, plaintiffs' interest claim is without merit because it is made under KRS 403.304-235, which the Supreme Court of Kentucky has held applies only to first-party claims. *Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d 437, 454-5 (Ky. 1999).  The Court notes that all claims for interest on the judgment in the underlying bad faith claim were specifically released in the release of November 12, 2009, in connection with the $1 million settlement.  (Doc. 94-8 at 8).

### CONCLUSION

As the above discussion demonstrates, the strict *Wittmer* standards are still in effect for Kentucky bad faith actions, and plaintiffs have not met them.

Therefore, having reviewed this matter, and the court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 94) be, and is hereby, **GRANTED**.  A separate

---

[7]  Further, even if relevant, the Court would not admit these reports because, given the facts of this case, their marginal probative value is far outweighed by their substantial prejudicial effect.  Fed. R. Evid. 403.

judgment dismissing the complaint shall be entered concurrently herewith.

This 13th day of November, 2012.



Signed By:
**William O. Bertelsman**
**United States District Judge**